**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THOMAS DOSWELL; | : | C.A. No. 07-0761 |
| RAYMOND THOMAS LOWRY, | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Jury Trial Demanded |
| | : | |
| CITY OF PITTSBURGH; | : | |
| DETECTIVE HERMAN WOLF, in | : | CHIEF JUDGE |
| his individual capacity, | : | DONETTA W. AMBROSE |
| Defendants. | : | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

**I.    Introduction**

Defendants have filed a Motion for Summary Judgment in which they argue that plaintiffs

have failed to establish sufficient facts to support the constitutional and state-law claims alleged in

the Complaint.  Defendants' arguments are seriously flawed in that they fail to present the facts in

the light most favorable to the plaintiffs, ignore clearly established constitutional principles that

support plaintiffs' legal claims, and argue, in the face of controlling authority to the contrary, that

state-court decisions in this case preclude certain claims.  As the record in this case fully supports

each of plaintiffs' claims on individual and municipal liability, the motion should be denied.

**II.    Statement of Facts[1]**

**A.    Facts Relating to the Liability of Defendant Wolf**

At about 6:00 a.m. on March 13, 1986, Helen Tokar was raped in the lunch room of Forbes

---

[1] Unless otherwise indicated, all factual citations are to Plaintiffs' Response to Defendants'
Concise Statement of Material Facts and Plaintiffs' Statements of Material Undisputed and
Disputed Facts ("Pls.' 56.1 Stmt."), which contains citations to the record.

Hospice, in Pittsburgh, Pennsylvania, where she worked.  (Pls.' 56.1 Stmt. ¶¶ 1-3.)  Tokar provided

a general description of her assailant – a black male, approximately 28 years old, 5'5" to 5'9" tall,

medium complexion, medium build, with short hair, wearing a gray shirt, beige jacket, blue jeans

and tennis shoes – to responding officers.  (¶ 8.)  She also said she had injured her assailant by

breaking a coffee cup over his head.  (¶¶ 52-53.)

A witness to the incident, Ora Jean Bolte, told police she observed the assailant as he ran

from the hospital, but that she could not identify him.  (¶ 103.)  The case was assigned that morning

to defendant Detective Herman Wolf, who had been the lead detective in a prior rape prosecution

of plaintiff Doswell.  (¶¶ 9, 71-72.)  In the prior case, after the jury found Doswell not guilty of rape,

Wolf, angry about the verdict, threatened Doswell that he would someday "get" him.  (¶ 102.)

Based solely on the initial, vague description, and before speaking to any witnesses or

conducting any investigation, Wolf brought with him to his first interview of Tokar at Shadyside

Hospital a photo array including a photograph of Doswell as the prime suspect along with seven

fillers.  (¶¶ 10-11, 22, 51.)  Pursuant to City of Pittsburgh ("City") policy, Doswell's photograph was

marked with the letter "R" denoting that Doswell has a prior rape arrest; none of the other photos

were so marked.  (¶¶ 11, 24, 74.)  The Pittsburgh Police Department ("PPD") policy was to include

only one photograph per array with the "R" designation, as that would help to facilitate the

identification of the prime suspect.  (¶ 78.)   Wolf believed that this policy and practice was

unconstitutionally suggestive, but he nevertheless complied with it and showed this tainted array to

Tokar.  (¶ 77, 82, 85.)  A jury could conclude based on Wolf's bias against Doswell, his improper

focus on Doswell as the sole suspect before he had done any investigation, his intentional use of a

photo array he knew to be impermissibly suggestive, and the direct evidence of his overt suggestion

2

during the only other identification procedure he conducted in this case (discussed below), that Wolf also engaged in other suggestive behavior during the identification procedure with Tokar. (¶¶ 13, 51, 77, 85-86,102-04.)  These suggestive actions achieved the desired end – a misidentification by Tokar of Doswell, even though Doswell was innocent of this crime. (¶¶ 13, 49, 77-78, 82-86.)

When the witness, Bolte, informed Wolf that she could not make an identification, Wolf proceeded to pressure and coerce her to make a false identification of Doswell and testify to that misidentification at trial. (¶¶ 39-41, 103-04.) Wolf also either deliberately failed to investigate what police believed to be a second assault by Tokar's assailant – less than an hour later and blocks away from the Tokar rape – or buried the exculpatory results of that investigation. (¶¶ 54-56, 113-14.)

Wolf then fabricated evidence against Doswell.  First, to account for the fact that Tokar said she struck her assailant on the head with a coffee cup with such force that it broke, Wolf falsely reported that Doswell had an injury on his face when arrested later that day. (¶¶ 52-53, 57-58, 105-06.) Wolf also falsely asserted that Doswell had recently shaved when arrested, that the neck brace he wore at his preliminary hearing a week after the assault was new (to suggest that Doswell was bolstering a bogus defense that his physical ailments would have prevented him from being the rapist), and that he had offered a false alibi. (¶¶ 59-66, 107-12.) To ensure that the fabrications of evidence and other unconstitutional conduct would not come to light, Wolf deliberately withheld all of his illegal and suggestive conduct from the prosecutor and the defense. (¶¶ 67-70.)

As a direct result of Wolf's unconstitutional acts, including coercion of witnesses, fabrication of evidence, providing false testimony against Doswell, failure to disclose exculpatory evidence, and use of highly suggestive and impermissible identification procedures, Doswell was wrongfully convicted. He served more than19 years before DNA testing finally exonerated him. (¶¶ 36, 49.)

Wolf's actions also deprived Doswell's then 4-year-old son, Raymond Thomas Lowry, of the presence and support of his father for over 19 years. (¶¶ 49, 73.)

### B.     Facts Relating to Municipal Liability

In 1986, the City had an official practice and policy of marking with a clearly visible letter "R" police booking photographs of all persons charged with sexual assault.  (¶¶ 24, 74.)  The "R" marking was put on the photos specifically to provide a set of photographs of suspects for use in photo spreads in future sexual assault investigations.  (¶ 75.)  The use of a photograph with this "R" designation in a photo spread shown to a victim or witness of a sexual assault is highly suggestive and completely unnecessary as a matter of police practice.  (¶ 77.)

The PPD as a matter of sexual assault investigation practice and policy placed a single  "R"-designated photograph of the main suspect in photo spreads with no other similarly marked photographs.  (¶¶ 78.)  The PPD used this highly suggestive and unnecessary procedure, with full knowledge of the obvious risk of misidentifications this posed, to encourage witnesses and victims to select the photo of the suspect marked with the "R."  (¶¶ 78, 82-84.)  No other police department in the United States used this procedure in the identification of suspects by photo spread.  (¶ 79.) Since Doswell had been arrested for rape (but acquitted of that charge) in 1984, the front of his police photo was prominently marked with the "R".  (¶ 81.)  Wolf did not mask the "R" or use other similarly marked photos as fillers (even though he knew that Doswell was thereby branded as a rapist), as he was not permitted to deviate from official policy and practice.  (¶¶ 76, 85-86.)

As of 1986, the PPD provided no training or supervision to detectives assigned to sexual assault investigations with respect to constitutionally adequate identification procedures or the duty to conduct fair and impartial investigations, including the maintenance and disclosure of all

exculpatory evidence, and no supervision or discipline enforcing the duty not to fabricate evidence or commit perjury.  (¶¶ 87, 91-101.)  Wolf, having not received any training or supervision in these areas of police work, sought to learn his duties and responsibilities by the "school of hard knocks," hoping for "good luck."  (¶ 88.)  As a result of this failure to train and supervise detectives in these essential aspects of sexual assault investigation, and the laissez-faire atmosphere that created, Wolf engaged in constitutionally impermissible identification procedures, failed to disclose exculpatory evidence, fabricated evidence against Doswell, and coerced an eyewitness into a misidentification. (¶ 115, 117-18.)

The PPD had no directives, protocols, training, or other formal policies regarding the situations where, by virtue of a conflict of interest, settled bias, or prejudice, a detective should not be the investigator on a particular criminal investigation.  (¶ 90.)  Due to the City's failure to address the conflict issue and to provide any guidance to Wolf, he failed to recuse himself from the investigation of the Tokar rape (in which he decided solely on the basis of a vague and general description that Doswell was the assailant) even though he had threatened "to get" Doswell after his acquittal on a previous rape charge.  (¶116.)

In 1986, the City was deliberately indifferent to its duty to supervise and discipline its police officers, enabling – indeed, inviting – them to commit misconduct with impunity.  (¶¶ 91-101, 115, 117-18.)  Investigations of civilian police misconduct complaints for the relevant period (1983-1990) did not follow professional standards for fair and impartial investigations, were internally inconsistent, resulted in the cover-up of police misconduct, and were designed to discredit complainants and protect officers, regardless of the facts.  (¶ 91.)  For example, the Office of

Professional Standards ("OPS")[2] would not sustain a complaint unless the complainant's allegations were "corroborated"; thus, even where a complainant was completely credible and a police officer not credible, without other witnesses or evidence, the complaint would not be sustained. (¶ 92.) The City failed to conduct any supervision or oversight of OPS operations for the relevant time period (1980-1990) and failed to perform any audits, statistical analysis, or other reviews of the processes, investigations, or operations at OPS in its consideration and disposition of civilian complaints. (¶ 93.) The City failed to consider judgments, court opinions, or settlements in cases successfully litigated against police officers on allegations of violations of constitutional rights. (¶ 94.) Further, even when this practice was changed (after Doswell's arrest and prosecution), and the City started a process of review of such judgments and settlements, the City failed to impose proper or consistent discipline commensurate with the misconduct of the offending officers. (*Id.*)

The City was found liable in a series of cases for having practices, policies, and customs that caused the violation of citizens' constitutional rights, in which OPS processes were found constitutionally flawed. *See, e.g., Beck v. City of Pittsburgh*, 89 F.3d 966 (3d Cir. 1996) (PPD's internal affairs process found unconstitutional); *Bielevicz v. Dubinon*, 915 F.2d 845 (3d Cir. 1990) (pattern of false arrests); *Betz v. City of Pittsburgh*, C.A. No. 88-789 (W.D. Pa.) (jury finding of City custom and practice of pretext arrests); *Dutchko v. City of Pittsburgh*, C.A. No. 91-1506 (W.D. Pa.) (no disciplinary action despite specific finding by court of constitutional violation). (¶ 95.)

In 1997, the City entered into a Consent Decree with the U.S. Department of Justice ("DOJ") which was described by then-Police Chief Robert McNeilly as a decree that "was about reform for

---

[2]  This office is alternately referred to in the documents provided by the City as the Office of Professional Standards ("OPS") and the Office of Professional Responsibility ("OPR").  For clarity, plaintiffs will refer to it throughout as "OPS."

a department that was in need of some reformation." (¶ 96.)   In conjunction with the DOJ proceedings, there was a performance audit of OPS in 1996, the first of its kind for the PPD, detailing its complete failure to discipline officers for misconduct. (¶ 97-101.)

Plaintiffs have submitted reports from three police practices experts. Professor Gary Wells and a former detective, Paul Carroll, opine regarding the identification procedures defendants used. (Exs. S, U.) Both experts condemn, without qualification, the use in a rape investigation of a photo spread in which a single photograph is marked distinctively with an "R" as highly and unnecessarily suggestive. (Ex. S at 11-15; Ex. U at 5-6.) Further, the experts support plaintiffs' claims regarding Wolf's coercive and suggestive identification practices, and the City's responsibility for them as a result of its policies and its failure to train and supervise Wolf. (Ex. S at 11-15; Ex. U at 5-6.)

Professor Paul McCauley's report fully supports plaintiffs' municipal liability claims that the City's failure to properly train, supervise, and discipline officers and detectives in the PPD caused Wolf to act unconstitutionally. (Ex. T.) McCauley found a lack of training and supervision on key aspects of PPD detectives' investigative work in sexual assault cases and further found that the civilian complaints system governing police discipline was dysfunctional in 1986. (*Id.* at 31-33.)

## III.   Argument

### A.   Summary Judgment Standards

Defendants' summary judgment motion may only be granted if there are no genuine issues of material fact and defendants are entitled to judgment as a matter of law. *DL Resources, Inc. v. FirstEnergy Solutions Corp.*, 506 F.3d 209, 216 (3d Cir. 2007); Fed. R. Civ. P. 56(c). In evaluating the record, "[i]nferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be

taken as true." *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir.

1992).  To defeat summary judgment, the nonmovant must merely present "more than a scintilla"

of evidence, whether it be direct or circumstantial.  *McCabe v. Ernst & Young, LLP*, 494 F.3d 418,

424 (3d Cir. 2007) (internal quotation and citation omitted).  The Court may not "weigh the evidence

or make credibility determinations . . . [as] these tasks are left for the fact-finder."  *Petruzzi's IGA*

*Supermarkets, Inc. v. Darling-Delaware Co., Inc.,* 998 F.2d 1224, 1230 (3d Cir. 1993) (internal

citation omitted).  An issue is genuine, precluding summary judgment, "if a reasonable jury could

possibly hold in the nonmovant's favor on that issue." *Congregation Kol Ami v. Abington Township*,

309 F.3d 120, 130 (3d Cir. 2002).

Defendants fail to consider the evidence in the light most favorable to plaintiffs, as they (and

this Court) must do on defendants' motion for summary judgment.  *Big Apple BMW*, 974 F.2d at

1363.  Once that is done, a jury could easily find that Wolf engaged in repeated misconduct in this

case as a result of the City's policies, practices, and customs, and that this misconduct caused

Doswell's wrongful conviction and 19 years of imprisonment.

## B.     Federal Constitutional Claims

Plaintiffs assert several related constitutional claims.  Plaintiff Doswell asserts that he was

denied his right to a fair trial under the Due Process Clause of the Fourteenth Amendment, that he

was subject to a malicious prosecution in violation of the Fourth and Fourteenth Amendments, and

that his unlawful incarceration was cruel and unusual punishment under the Eighth Amendment.

Plaintiff Lowry claims that his right to familial association under the Fourteenth Amendment was

violated when, at the age of four (and for the next 19 years), he was deprived of his father's care and

association.  Finally, plaintiffs claim that the City, by its policies, practices, and customs, caused

each of these constitutional violations.  We address these issues in turn.

### 1.   Plaintiff Doswell's Right to a Fair Trial

Defendants concede "that a claim lies under 42 USC § 1983 if a state actor interferes with the right to receive a fair trial."  (D.E. 48 at 23.)  This concession is well taken, as the case law convincingly demonstrates that plaintiffs' assertions regarding unconstitutional identification procedures, falsification and fabrication of evidence, coercion of witnesses, subornation of false testimony, and failure to disclose exculpatory evidence state claims under the Fourteenth Amendment.  *See, e.g., Yarris v. County of Delaware*, 465 F.3d 129, 138-43 (3d Cir. 2006) (recognizing § 1983 claims for fabricating evidence and deliberately destroying exculpatory evidence); *Gibson v. Superintendent of N.J. Dep't of Law & Pub. Safety*, 411 F.3d 427, 443 (3d Cir. 2005) (recognizing § 1983 claim against police officers for suppression of *Brady*[3] information from prosecutors and defense); *Gregory v. City of Louisville*, 444 F.3d 725, 745-46 (6th Cir. 2006) (denying summary judgment to police officer on § 1983 claim that police officers' use of an impermissibly suggestive identification procedure and *Brady* violations in a 1992 investigation led to plaintiff's wrongful conviction); *Washington v. Wilmore*, 407 F.3d 274, 282 (4th Cir. 2005) (in a § 1983 wrongful conviction suit, holding constitutional violation exists where police defendant "fabricated evidence and that . . . fabrication resulted in a deprivation of [plaintiff]'s liberty"); *Pierce v. Gilchrist*, 359 F.3d 1279, 1285 (10th Cir. 2004) (recognizing § 1983 cause of action for a violation of "the Fourteenth Amendment right not to be deprived of liberty without due process of law . . . as the result of the fabrication of evidence by a government officer acting in an investigative capacity"); *Zahrey v. Coffey*, 221 F.3d 342, 355 (2d Cir. 2000) ("It is firmly established that a constitutional

---

[3]  *Brady v. Maryland*, 373 U.S. 83 (1963).

right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer."); *Sanders v. English*, 950 F.2d 1152, 1160 (5th Cir. 1992) ("[T]he intentional use of unduly suggestive identification procedures can support a § 1983 action.").

Defendants argue that, under their version of the facts, Doswell received a fair trial. Whatever one might conclude based on the defendants' factual assertions, on defendants' motion for summary judgment, the facts must be viewed in the light most favorable to plaintiffs. *Big Apple BMW,* 974 F.2d at 1363. In that light, the record shows that: based on their prior interactions, Wolf was irrationally biased against Doswell before this case began; as a result he unreasonably made Doswell the only suspect in the Tokar rape before he had spoken to the victim or done any other investigation; he intentionally used a photo array that he knew impermissibly singled out Doswell's photograph; he engaged in other suggestive conduct during his interactions with Tokar to ensure her misidentification of Doswell as her assailant; he then used direct suggestion during his identification procedure with the sole other witness, Bolte, to procure a misidentification and, when that was unsuccessful, threatened her into falsely identifying Doswell as the assailant at trial; to shore up his manufactured case he fabricated evidence against Doswell, including that, like the true perpetrator, Doswell had an injury to his head, that Doswell had recently shaved when arrested (to explain the lack of facial hair Tokar described), and that Doswell presented a false alibi and pretended to have a debilitating neck injury at the time of the crime; Wolf deliberately failed to investigate the related case committed less than an hour later by the same perpetrator as the Tokar rape and/or covered up exculpatory evidence revealed in any investigation of that case; and Wolf withheld all of this exculpatory evidence – including evidence of his misconduct – from the prosecutor and defense. Thus, as the cases uniformly hold, a reasonable jury could find that Wolf denied Doswell a fair trial.

10

On the merits, defendants ignore plaintiffs' well-supported facts, and therefore their fact-based argument fails. But they make two other arguments. First, defendants argue that the Superior Court of Pennsylvania decision reviewing Doswell's conviction precludes Doswell from relitigating the suggestiveness of the identification procedure or the existence of probable cause.[4] (D.E. 48 at 12, 23-24.) Defendants fail to cite controlling Third Circuit law establishing that, where a prior conviction has been vacated and the charges dismissed, there is no final judgment as required for collateral estoppel to apply. *See Stolt-Nielsen, S.A. v. United States*, 442 F.3d 177, 187 n.7 (3d Cir. 2006) ("A judgment that has been vacated, reversed, or set aside on appeal is thereby deprived of all conclusive effect, both as res judicata and as collateral estoppel") (internal citation omitted). The Third Circuit has specifically held that "the Restatement [of Torts]'s rule that an overturned municipal conviction presumptively establish[es] probable cause contravenes the policies underlying the Civil Rights Act and therefore does not apply to a section 1983 malicious prosecution action." *Montgomery v. DeSimone*, 159 F.3d 120, 125 (3d Cir. 1998) (reasoning that "[t]he central aim of the Civil Rights Act is to protect citizens from the misuse of power by individuals cloaked with the authority of state law.")

Furthermore, none of the issues presented in this lawsuit were fully and fairly litigated at the state criminal trial, precisely because Wolf covered up his misconduct.[5] For example, the fact that

---

[4] The lack of probable cause is not an element of plaintiffs' fair trial claims, *see, e.g., Dominguez v. Hendley*, Nos. 07-1004, 07-1005, 07-3030, 2008 WL 4395651, at *3 (7th Cir. Sept. 30, 2008), but it is an element of plaintiffs' malicious prosecution claim, addressed below, *see Johnson v. Knorr*, 477 F.3d 75, 81-82 (3d Cir. 2007). As defendants raise the same arguments with respect to the supposed preclusive effect of the Superior Court decision on both issues, plaintiffs will address them here.

[5] As we discuss below in connection with the state law claims, both the Pennsylvania and federal courts recognize an exception to collateral estoppel principles where there was "fraud or other undue influences at work in the conviction proceeding." *See, e.g., Cosmas v. Bloomingdales*

Wolf used coercive methods to induce Bolte to misidentify Doswell was never disclosed in the state proceedings; this would have undermined not only Bolte's identification but Tokar's as well. *See Commonwealth v. Fowler*, 352 A.2d 17, 22 (Pa. 1976) (holding suggestiveness of identification procedure "cannot be properly resolved without a careful and detailed analysis of the totality of the circumstances affecting the witness's identification"). Similarly, other issues such as whether Doswell had a facial injury or had recently shaved were not fully and fairly litigated because of Wolf's fabrications, which prevented the jury from fairly evaluating the evidence as a whole. *See Robinson v. Volkswagenwerk AG*, 56 F.3d 1268, 1274 n.5 (10th Cir. 1995) ("[C]oncealment of material information by a party may justify a refusal to give preclusive effect to a judgment.") (*citing* Restatement (Second) of Judgments § 28 cmt. j.).

Second, defendants reprise an argument this Court already rejected that superceding acts by the prosecutor and courts break the causal chain of liability. (D.E. 16 at 6-7.) The basic principles are not in dispute. In § 1983 cases, as in tort law generally, "a man [is] responsible for the natural consequences of his actions." *Monroe v. Pape*, 365 U.S. 167, 187 (1961); 42 U.S.C. § 1983 ("Every person who, under color of [state law] . . . subjects, *or causes to be subjected*, any . . . person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable") (emphasis added); *see also Washington*, 407 F.3d at 283 (in §1983 fabrication case, asking whether the "conviction was a reasonably foreseeable result of [defendant's] initial act of fabrication"). Causation is almost always a jury question. *See Rivas v. City of Passaic*, 365 F.3d 181, 193 (3d Cir. 2004).

Defendants cannot dispute the ample evidence from which a reasonable jury could find

---

*Bros., Inc.*, 660 A.2d 83, 86 (Pa. Super. Ct. 1995).

Wolf's misconduct caused Doswell's wrongful conviction.  This includes that Wolf's misconduct produced essentially all of the evidence against Doswell – from the misidentifications by Tokar and Bolte[6] to the fabricated evidence regarding Doswell's alleged head injury, recently having shaved, false alibi and fake neck injury – as well as ADA Krastek's testimony that, had he been aware of Wolf's abundant misconduct, he may have *nolle prossed* the case.  Similarly, if the jury had been aware of Wolf's pervasive misconduct, they may have distrusted his entire investigation and all the evidence it produced.  *See Atkins v. County of Riverside*, 151 Fed. Appx. 501, 504 (9th Cir. 2005) (slip op.) ("Evidence that a chief investigator fabricated evidence while attempting to build the case against the defendant undermines the credibility of that investigator as well as the evidence compiled in that investigation.")

Nevertheless, defendants argue that the acts of the prosecutor and state courts were a superceding cause of the injuries to plaintiffs.  (D.E. 48 at 25 (citing *Wray v. City of New York*, 490 F.3d 189 (2d Cir. 2007)).)  However, as this Court has already ruled, *Wray* is plainly distinguishable since, in that case, the court assumed that the police officer was honest, whereas here, Wolf was not. (D.E. 16 at 6-7.)  This ruling is consistent with the rulings of the Third Circuit and other courts.  *See Hector v. Watt*, 235 F.3d 154, 164 (3d Cir. 2000) (decision of independent intermediary "will only constitute an intervening cause if the decision is genuinely free from deception or coercion");

---

[6]  In addition to Bolte's direct testimony that Wolf coerced her into misidentifying Doswell, the jury may rely on the expert opinions of Wells and Carroll that Wolf's suggestive behavior caused both Tokar's misidentification of Doswell and her certainty in her identification.  Furthermore, the tainted photo array was especially pernicious as it would improperly affect not only witnesses to whom it was shown but also the jury evaluating its propriety; for defense counsel to fully explore at trial the suggestiveness of having only Doswell's photograph branded with an "R," he would have to disclose Doswell's prior arrest for rape – an extremely prejudicial fact that ordinarily would not come before the jury.

*McKinley v. City of Mansfield*, 404 F.3d 418, 438-39 (6th Cir. 2005) (chain of causation not broken where prosecutor introduces compelled statements at trial). As detailed above, plaintiffs have presented ample evidence that Wolf misled the prosecutor and courts, and "[he] cannot hide behind the officials whom [he has] defrauded." *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988).

## 2.     Plaintiffs' Claim of Malicious Prosecution

To establish his § 1983 Fourth and Fourteenth Amendment malicious prosecution claim, Doswell must show that:

> (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

*Johnson v. Knorr*, 477 F.3d 75, 81-82 (3d Cir. 2007) (footnote omitted).[7]

Defendants contest only the third element, arguing that Tokar's identification of Doswell established probable cause. However, a reasonable jury could find that Wolf knew the evidence he collected – including Tokar's identification – was false and/or unreliable, and therefore did not provide probable cause. *See Parsons v. City of Pontiac*, 533 F.3d 492, 501 (6th Cir. 2008) ("In general, the existence of probable cause in a § 1983 action presents a jury question.") (internal citation and quotation omitted); *Harper v. City of Los Angeles*, 533 F.3d 1010, 1012 (9th Cir. 2008) (same). Where an investigating detective knows, as Wolf has testified in this case, that the identification practices he employs are highly suggestive and likely to lead to a misidentification, there cannot be a legitimate finding of probable cause.

---

[7] *Hector*, 235 F.3d at 156, indicates Doswell might also have to prove his innocence, but defendants have so stipulated. (Pls.' 56.1 Stmt. ¶ 49.)

> While . . . a positive identification by a victim witness, without more, would usually be sufficient to establish probable cause, this qualified precept cannot be rendered absolute.  Independent exculpatory evidence or substantial evidence of the witness's own unreliability that is known by the arresting officers could outweigh the identification such that probable cause would not exist.  Each case must therefore be examined on its facts.

*Wilson v. Russo*, 212 F.3d 781, 790 (3d Cir. 2000); *see also Torres v. City of Los Angeles*, 540 F.3d 1031, 1042 (9th Cir. 2008) (reasonable jury could find lack of probable cause where witness identification was based on suggestive identification procedure); *Green v. City of Paterson*, 971 F. Supp. 891, 904 n.8 (D.N.J. 1997) ("The basis for excluding an identification at trial is an appropriate basis for determining whether an identification should be excluded from a probable cause analysis."). Here, where all of the inculpatory evidence against Doswell was the product of Wolf's unconstitutional conduct, and where Wolf was aware of but suppressed substantial exculpatory evidence, such as Doswell's prior neck ailment and lack of a head injury consistent with being hit by a cup, a reasonable jury could find there was no probable cause.  *See Parsons*, 533 F.3d at 500-01 ("A police officer has probable cause only when he discovers *reasonably reliable information* that the suspect has committed a crime . . . [and] cannot look only at the evidence of guilt while ignoring all exculpatory evidence.") (emphasis in original, internal citation and quotation omitted).

### 3.    Defendant Wolf is Not Entitled to Qualified Immunity

"If the court concludes that the defendant's conduct did violate a clearly established constitutional or statutory right, then it must deny the defendant the protection afforded by qualified immunity."  *Williams v. Bitner*, 455 F.3d 186, 190 (3d Cir. 2006).  "A right may be clearly established even if there is no previous precedent directly in point."  *Doe v. Groody*, 361 F.3d 232, 243 (3d Cir. 2004) (internal quotations and citations omitted).  "The relevant, dispositive inquiry .

. . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

It has long been clearly established that it is unconstitutional to prosecute without probable cause. *Losch v. Borough of Parkesburg, Pa.*, 736 F.2d 903, 907 (3d Cir. 1984) ("It is clear that the filing of charges without probable cause and for reasons of personal animosity is actionable under § 1983."). Wolf's fabrication of evidence was also a violation of Doswell's clearly established constitutional rights. *See Miller v. Pate*, 386 U.S. 1, 7 (1967) ("[T]he Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence."); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (Fourteenth Amendment right not to be deliberately subjected to trial based on "false evidence" is "implicit in any concept of ordered liberty."); *Curran v. Delaware*, 259 F.2d 707, 713 (3d Cir. 1958) ("[T]he knowingly false testimony of Detective Rodenheiser . . . was sufficient to cause the defendants' trial to pass the line of tolerable imperfection and fall into the field of fundamental unfairness."); *see also Washington*, 407 F.3d at 283-84 (denying qualified immunity to police officer for fabrication used at 1983 trial).

Wolf's intentional and knowing use of an impermissibly suggestive identification procedure, one substantially likely to cause a misidentification, violated clearly established law itself. *Simmons v. United States*, 390 U.S. 377, 383-84 (1968) (holding photographic identification procedure violates due process if it is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification," such as where witness is shown array in "which the photograph of a single . . . individual recurs or is in some way emphasized"); *Neil v. Biggers*, 409 U.S. 188, 198 (1972); *Comm. v. Fowler*, 352 A.2d 17, 24-25 (Pa. 1976) (suppressing identification as unduly suggestive where "appellant's photograph stood out as a significantly different type of

16

photograph"); *see also Geter v. Fortenberry*, 849 F.2d 1550, 1559 (5th Cir. 1988) (denying qualified immunity to police officer who in 1982 "procure[d a] false identification by unlawful means" as "such activity violates clearly established constitutional principles"); *Gregory*, 444 F.3d at 745-46 (denying qualified immunity to police officer who used unconstitutionally suggestive identification procedure).

Defendants' argument that Wolf could not have known the identification procedure was unconstitutionally suggestive if the courts did not suppress it is mistaken: Wolf *admits* he knew. (Pls.' 56.1 Stmt. ¶ 85.) *See Malley v. Briggs*, 475 U.S. 335, 345-46 (1986) (holding that officer who submits affidavit for arrest warrant that clearly does not establish probable cause is not entitled to qualified immunity even though judge approves the warrant). In any event, as detailed above, the state courts could not consider the full circumstances of the identification procedure because Wolf wilfully concealed them. The evidence now shows that, as in *Foster v. California*, "[i]n effect, [Wolf] repeatedly said to the witness, 'This is the man.'" 394 U.S. 440, 443 (1969) (suppressing identification procedure as unduly suggestive).

Wolf's entire course of conduct, including intentionally suppressing his misconduct from the prosecutor, deprives him of qualified immunity. *Gallo v. City of Philadelphia*, 161 F.3d 217, 220 n.4 (3d Cir. 1998) (where officer withheld exculpatory information that "goes to the essence of the . . . charges," he is not entitled to qualified immunity); *cf. Gibson v. Superintendent of NJ Dep't of Law & Pub. Safety*, 411 F.3d 427, 443 (3d Cir. 2005) (awarding officers qualified immunity for 1994 misconduct where only fair trial violation was suppressing *Brady* material). Since Wolf engaged in a broad range of unconstitutional conduct, whether or not an officer's *Brady* duty to disclose exculpatory evidence was clearly established as of 1986, Wolf's overall conduct in vindictively

17

seeking to convict an innocent person cannot be shielded by qualified immunity. *See Limone v. Condon*, 372 F.3d 39, 46-47 (1st Cir. 2004) (denying qualified immunity to officers who in 1967 caused plaintiffs' wrongful convictions, even though the *Brady* duty on police officers was arguably not clearly established then, because *Brady* violations were only a part of defendants' pervasive violations of plaintiffs' fair trial rights); *Crawford v. Pennsylvania*, No. Civ. A. 1CV03-693, 2005 WL 2465863 at *10 (M.D. Pa. Oct. 6, 2005) (Where defendants in 1970s investigation withheld exculpatory information, falsified documents, fabricated evidence, gave misleading or perjured testimony, and maliciously prosecuted plaintiff: "[i]t strains credibility to think that police officers could participate in the conduct alleged here and not understand that their actions violate the accused's rights."), *diff't part of opinion rev'd on reconsideration by* 2006 WL 148881 (M.D. Pa. Jan 19, 2006).[8] "[S]ome truths are self-evident.  This is one such: if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit." *Limone*, 372 F.3d at 44-45.  As "it would be clear to a reasonable officer that [Wolf's] conduct[, as a whole,] was unlawful in the situation he confronted," he is not entitled to qualified immunity. *Saucier*, 533

---

[8]  While plaintiffs' fair trial claim against Wolf does *not* include Wolf's perjury at trial, for which he enjoys absolute immunity, *see Briscoe v. LaHue*, 460 U.S. 325, 345-46 (1983), such perjury is circumstantial evidence of defendant's initial fabrications and other intentional unconstitutional behavior.  *Harris v. Roderick*, 126 F.3d 1189, 1199 (9th Cir. 1997) ("We do not believe that the general policy that immunizes false official testimony requires that we preclude [plaintiff] from showing the full range of occasions on which [defendants'] falsehoods were uttered, simply because some of them occurred before a grand or petit jury"); *see also Limone v. United States*, 271 F. Supp. 2d 345, 357 (D. Mass. 2003) ("[T]he fact of perjury is a significant piece of evidence, part of the 'story' underlying [plaintiff's] claims."), *aff'd sub nom Limone v. Condon*, 372 F.3d 39 (1st Cir. 2004).  In addition, the City is not entitled to any immunities, *Owen v. City of Independence*, 445 U.S. 622, 638 (1980), and may be held liable for causing Wolf's perjury.

U.S. at 202; *see also Russo v. City of Bridgeport*, 479 F.3d 196, 212 (2d Cir. 2007) (On qualified immunity, "the proper inquiry is whether the *right* itself – rather than its *source* – is clearly established.") (emphasis in original).

### 4.     The Eighth Amendment Violation

Defendants argue that plaintiffs have failed to prove an Eighth Amendment violation, but in doing so they ignore this Court's prior ruling upholding this claim.  (D.E. 16 at 8.)  The fact that Eighth Amendment claims usually arise in cases alleging unconstitutional conditions of confinement is irrelevant.  Indeed, in *Herrera v. Collins*, a majority of the Supreme Court indicated that it "may violate the Eighth Amendment to imprison someone who is actually innocent." 506 U.S. 390, 432 n.2 (1993) (Blackmun, J., dissenting, joined by Stevens, J., and Souter, J.); *see also id.,* 506 U.S. at 419 (O'Connor, J., concurring, joined by Kennedy, J.) ( "I cannot disagree with the fundamental legal principle that executing the innocent is inconsistent with the Constitution."); *cf. Triestman v. United States*, 124 F.3d 361, 378-79 (2d Cir. 1997) ("[S]erious Eighth Amendment . . . questions would arise" if actually innocent prisoner had no legal forum to demonstrate his innocence.); *Holloway v. Jones*, 166 F. Supp. 2d 1185, 1190 (E.D. Mich. 2001) ("[T]o preclude a petitioner who can demonstrate that he or she is factually innocent of the crimes that he or she was convicted of [from proving that innocence in court] would violate . . . the Eighth Amendment's ban on cruel and unusual punishment.").  Surely, if it amounts to cruel and unusual punishment to incarcerate an individual even for one day for an illness, *see Robinson v. California*, 370 U.S.660, 667 (1962), it is cruel and unusual punishment for an innocent person to be incarcerated due to the violation of his rights to a fair trial and by means of a malicious prosecution.

### 5.    The Right to Familial Association

This Court has "reject[ed] the Defendants' contention that the Third Circuit court's decision in *McCurdy v. Dodd*, 352 F.3d 820 (3d Cir. 2003), forecloses Lowry's claim here."  (D.E. 16 at 9) (footnote omitted).  Many other courts have found that a minor child may bring a § 1983 claim for deprivation of his constitutional rights caused by the death or detention of his parents.  *See, e.g., Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991), *Ovando v. City of Los Angeles*, 92 F. Supp. 2d 1011, 1017-19 (C.D. Cal. 2000); *Greene v. City of New York*, 675 F. Supp. 110, 113-15 (S.D.N.Y. 1987); *Mombourquette v. Amundson*, 469 F. Supp. 2d 624, 654 (W.D. Wis. 2007).

Even if *McCurdy*'s rule that defendant's action must be directed at the parent-child relationship did extend to actions brought on behalf of minor children, *McCurdy* is distinguishable because the factual situation – a shooting – made it clear that the officer's actions were not so aimed.  *McCurdy*, 352 F.3d at 830 ("Cynthia Dawson, McCurdy, and the parent-child relationships between them and their son were not on DiPasquale's mind when he pulled the trigger.").  Here, in contrast, Wolf's misconduct occurred over a long period of time and was deliberate.  Further, he plainly knew about Doswell's 4-year-old son Raymond Lowry as he engaged in this misconduct (Pls.' 56.1 Stmt. ¶ 73) and therefore knew the impact Doswell's wrongful conviction would have on Lowry.  A reasonable jury could find that Wolf violated Lowry's due process rights by causing the wrongful conviction and 19-year incarceration of his father.  *See Rivas*, 365 F.3d at 193 (Causation in a § 1983 action "is normally a question of fact for the jury.").

### 6.    Plaintiffs Have Established the Liability of the City of Pittsburgh

There is compelling and, in many instances, overwhelming evidence supporting the City's liability for Wolf's unconstitutional acts.  Defendants have failed to suggest any material facts on

this issue and their legal arguments are largely boilerplate.[9]

### a.    General Principles Governing Municipal Liability

A municipality is liable for the constitutional torts of its police officers where the city has a policy, practice, or custom that causes an officer to act in an unconstitutional manner.  Under this doctrine, a city can be held liable where it has an official policy, where it fails to properly train, supervise, or discipline officers, or where it has a practice or custom of violation of rights.  *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978) (holding official policies and persistent practices or customs, even without formal approval, establish municipal policy); *City of Canton v. Harris*, 489 U.S. 378 (1989) (holding municipal liability established by deliberate indifference to need for training and supervision on issues that are likely to cause constitutional violations if not affirmatively addressed by municipality); *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) (holding single unconstitutional act can establish liability of city where actions of policymaker or city custom or practice caused the incident); *Andrews v. City of Philadelphia*, 895 F.2d 1469 (3d Cir. 1990) (finding police commissioner final policymaker for the City); *Beck*, 89 F.3d 966 (holding failure to have proper standards for investigation of civilian complaints establishes municipal liability); *Bielevicz*, 915 F.2d at 851; *Anela v. City of Wildwood*, 790 F.2d 1063, 1069 (3d Cir. 1986) (finding city liable for unconstitutional conditions of confinement because "[t]he description of the cells revealed a long-standing condition that had become an acceptable standard and practice for the City").

### b.    The City's Liability for Its Unconstitutional Policy, Custom, or Practice of Marking Rape Suspects in Photo Arrays With an "R"

Plaintiffs have argued that Wolf is liable for the due process violations regarding the

---

[9]  Plaintiffs are moving separately, pursuant to Fed. R. Civ. P. 56(d), to have the Court find many factual issues related to plaintiffs' *Monell* claims are not in dispute.

identification procedures he used in the investigation of the Tokar rape. The City has not contested plaintiffs' claim that there was a policy and practice of designating photographs of persons who have been arrested for rape or sexual assault with an "R," and to have detectives show photo arrays to rape victims in which only the suspect had such an "R" visibly displayed. The City's only preferred argument is that this practice is not unconstitutional. Accordingly, if the Court determines that there was a constitutional violation, *see* argument *supra*, summary judgment must be denied on the municipal liability claims.[10]

c.      **The City's Liability for Failure to Train and Supervise on How to Conduct Fair Investigations**

Beyond the official policy theory of municipal liability, the City is liable for malicious prosecution and other fair trial violations, including the constitutionally flawed identification procedures that extend beyond the use of the "R" designated photograph, fabrication of evidence, failure to conduct a fair and impartial criminal investigation, coercion of false testimony, and perjury. Among other things, as argued above, Wolf improperly suggested the identification of Doswell to the victim, Tokar, coerced an identification from the witness Bolte, and fabricated evidence regarding an injury on Doswell's face, his having recently shaved, his having provided a false alibi, and his wearing a "brand new" neck brace at his preliminary hearing. The City is liable for these constitutional violations for its failure, with deliberate indifference, to properly train and supervise Wolf and other officers and detectives on identification procedures and the disclosure of exculpatory

---

[10]   In these circumstances, the Court should also find that plaintiffs have proven two of the three elements of municipal liability: an unconstitutional act of an officer and a policy of the City. The third element, the issue of causation, is plainly one for the jury. *Bielevicz*, 915 F.2d 845; *Beck*, 89 F.3d 966. As part of their 56.1 statement of facts, plaintiffs have included their own statement of undisputed facts and are moving for an order that these facts are established for trial. *See* Fed. R. Civ. P. 56(d).

evidence as well as its failure to supervise and discipline them to ensure they did not fabricate evidence, coerce witnesses, or commit perjury, which failures caused Wolf's unconstitutional conduct.

In *City of Canton v. Harris*, 489 U.S. 378 (1989), the Supreme Court ruled that a municipality may be held liable for constitutional violations caused by its failure to train or discipline employees. Inadequate training is a basis for municipal liability where the failure to train amounts to "deliberate indifference" to the constitutional rights of persons with whom the police may come into contact, that is, where "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390.

A city is deliberately indifferent where it fails to train officers on a specific matter despite an obvious need for training to avoid violations of citizens' constitutional rights. *See, e.g., Gregory*, 444 F.3d at 754 (failing to train officers on the handling of exculpatory materials); *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 28 (1st Cir. 2005) (jury could find obvious need to train on avoiding off-duty misidentifications where department's always armed/always on-duty policy made friendly fire shootings likely to occur); *A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Center*, 372 F.3d 572, 583 (3d Cir. 2004) (finding genuine issue of material fact on whether need for written policies and procedures for investigation of incident reports was obvious); *Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997) (holding single violation is sufficient to invoke municipal liability if the area of police work is one that is likely to lead to violations of constitutional rights without proper training); *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1319 (10th Cir. 2002)

(finding genuine issue of material fact as to whether the county had notice of frequency of obsessive compulsive disorder and was deliberately indifferent in its failure to train jail pre-booking officers); *Walker v. City of New York*, 974 F.2d 293, 300 (2d Cir. 1992) (holding complete failure to train assistant district attorneys on their *Brady* obligations could constitute deliberate indifference).

Under this theory, there is compelling evidence that the City failed, with deliberate indifference, to properly train Wolf with respect to police identification practices. As discussed above, the City provided no training on proper identification methods, despite the City's knowledge that improper identification procedures lead to mistaken identifications and convictions of innocent persons. This is an area of law enforcement in which the need for training is manifest; unreliable, and otherwise unfair identification processes can seriously taint investigations. *See Bibbins v. City of Baton Rouge*, 489 F. Supp. 2d 562, 582-83 (M.D. La. 2007) (denying summary judgment on claim that city's failure to train on identification procedures caused misidentification and wrongful conviction). The City's unconstitutional "R" policy made it all the more important that they train officers in how to compensate by using fair identification practices generally. Because of the City's failure to train, Wolf compounded his improper use of a photograph with the designated "R" (as mandated by City policy) with the use of other improper methods, i.e. employing a photo spread without proper initial investigation of the case, using suggestive methods to secure an identification from the victim, and coercing the witness into a false identification of Doswell.

Neither did Wolf receive training with respect to other constitutionally mandated duties in the investigation of criminal cases, including his obligation under *Brady v. Maryland* to preserve and disclose to the prosecutor exculpatory evidence. Wolf candidly testified that self-training, learning by the "school of hard knocks," and hoping for "good luck" were the essential aspects of "training"

24

in the PPD. (Pls.' 56.1 Stmt. ¶ 88.) This evidence presents a jury question on the issue of whether

the City is liable for a failure to train. *Johnson v. Hawe*, 388 F.3d 676, 686 (9th Cir. 2004) (holding

jury could find city liable for a system that permits "self-training" of officers).

It is obvious that the failure to properly train on these issues can lead to unconstitutional

conduct on the part of officers and detectives.  For example, the failure to train as to the duty to

preserve and disclose exculpatory evidence can lead to wrongful prosecutions and convictions, and

without proper training, a detective may not know the proper standard for judging what types of

evidence are considered exculpatory.  Indeed, so necessary is this type of training that courts have

found governmental liability even against prosecutorial agencies where there has been a failure to

train. *See Carter v. City of Philadelphia*, 181 F.3d 339 (3d Cir. 1999); *Walker*, 974 F.2d at 300.[11]

Finally, the City is also liable for its failure to train and supervise detectives with respect to

their duty not to investigate cases in which they have a conflict of interest or a level of bias that

would likely lead to an unfair investigation.  Here, Doswell has produced evidence that Wolf

threatened to "get" him after his acquittal on rape charges in 1984, less than two years before the

Tokar rape.  Surely, it should be impermissible to be the lead investigator in a criminal case where

there was a settled and unfair bias against a particular suspect.  Yet, the PPD provided no guidance

---

[11]  Plaintiffs have also produced admissible expert testimony in support of these claims. *See Bordanaro v. McLeod*, 871 F.2d 1151 (1st Cir. 1989); *Johnson*, 388 F.3d at 686 (expert's evidence created genuine issue as to whether "'self-training' program, which assigned responsibility to the individual officer for keeping abreast of recent court decisions involving law enforcement, amounted to a 'failure to train'"); *Parker v. District of Columbia*, 850 F.2d 708 (D.C. Cir. 1988); *Keeney v. City of New London*, 196 F. Supp. 2d 190, 201 (D. Conn. 2002); *see also Beck*, 89 F.3d at 975-76 (absence of expert testimony should not have influenced district court's decision to enter judgment as a matter of law where it was "not beyond the ken of an average juror to assess what a reasonable municipal policymaker would have done with the information in this case").

or standards for this type of situation and as a result Wolf initiated and maintained his investigative role which, due to his bias, led to a fundamentally unfair investigation and trial of Doswell.

The City's argument that there was no pattern of misconduct by Wolf or by other officers with respect to identification procedures is without legal significance. Where the need for training is obvious, a city cannot avoid that duty by waiting for constitutional violations to occur. In these circumstances, the first violation is actionable against the city. *See, e.g., Harris*, 489 U.S. at 390.

### d.      The City's Liability for Failure to Discipline

A city's failure to properly discipline officers also states a theory of liability. *See, e.g., Beck*, 89 F.3d at 974 (holding jury could find inadequate procedures for investigating civilian complaints caused constitutional violations); *Vineyard v. County of Murray*, 990 F.2d 1207, 1212-13 (11th Cir. 1993) (upholding jury verdict that inadequate procedures for handling complaints against officers caused constitutional violations); *Gentile v. County of Suffolk*, 926 F.2d 142, 153 (2d Cir. 1991) (sustaining malicious prosecution claim against governmental entity based on county's failure to properly discipline officers). In *Beck*, 89 F.3d at 974, the Third Circuit addressed some of the constitutional flaws in the Pittsburgh procedures:

> It is not enough that an investigative process be in place . . . . "The investigative process must be real. It must have some teeth. It must answer to the citizen by providing at least a rudimentary chance of redress when injustice is done. The mere fact of investigation for the sake of investigation does not fulfill a city's obligation to its citizens." . . . Formalism is often the last refuge of scoundrels.

Once again, the facts fully support this theory of liability. There is compelling evidence that the PPD disciplinary process was seriously dysfunctional in 1986. (Pls.' 56.1 Stmt. ¶¶ 91-101.) Further, plaintiffs' police practices expert McCauley has submitted an extensive report detailing the PPD's systemic failures to properly supervise and discipline officers for the relevant time period.

First, upon review of a significant number of internal affairs files for the period 1983-1990, McCauley found a "pattern of police administrative/managerial conduct that makes the investigation, disciplinary, and training functions virtually meaningless.  In summary, the files were inconsistent, variable in format and process, and superficial as to content." (Ex. T at 12.) McCauley listed sixteen factors that severely compromised the internal affairs process.  (*Id.* at 13-14.)  Second, McCauley analyzed the PPD's 1996 Performance Audit of OPS and found that the PPD itself had determined that numerous problems plagued the internal affairs process, including the PPD's failure to properly investigate and discipline officers, the lack of any performance evaluation system, the lack of any early warning system, and the failure to track and monitor officers with long disciplinary records. (*Id.* at 15-16.)  McCauley also determined that, prior to the 1996 Audit (which was done at the time that the DOJ was about to file suit against the City for unconstitutional police practices), there had been no performance audits, no statistical analysis of OPS determinations, no analysis of complaints on operational issues such as improper police investigation procedures, false arrest, or use of force, and the lack of any system of progressive discipline.  (*Id.* at 16-17.)

Third, McCauley studied the PPD's practices with respect to the discipline of officers who were involved in cases in which judgments, settlements, and court decisions reflected incidents and patterns of police misconduct.  He found that, as of 1986, there was no process in place to review these cases to determine whether discipline or re-training was appropriate.  Even when the City started such a process in the early 1990s, his review of the 24 cases supplied by the City in discovery revealed that the process was "grossly inadequate." (*Id.* at 17-21.)  The case reviews did not enable the City to determine what caused the misconduct or what re-training or change of departmental procedures were required.  (*Id.* at 21.)  Finally, McCauley provides an analysis of the 1997 Consent

Decree between the City and the DOJ and finds additional evidence of systemic failures in the PPD's internal affairs processes.  (*Id.* at 21-23.)[12]

This factual record paints a disturbing picture of a police department that, as of 1986, had no functional internal affairs process.  Quite clearly, the message to police officers in the City was that misconduct would not be punished and the failure to adhere to procedural orders and directives would be tolerated.  As we have noted, the federal courts have made similar findings about the City in other cases.  (Pls.' 56.1 Stmt. ¶ 95.)  Ultimately, the DOJ found the PPD's problems serious enough to justify federal intervention on a theory of unconstitutional practice and custom.

In these circumstances, a jury could reasonably find that  Wolf engaged in the impermissible identification procedures and other unconstitutional conduct alleged in this case not only as a result of the policy of marking photographs with the scarlet "R" letter, and the City's failure to train with respect to proper identification procedures, but also from his knowledge that investigative misconduct would not properly be investigated or punished within the PPD.  That Wolf had not been the subject of civilian complaints is of no moment as plaintiffs' theory is that the overall failure to supervise and discipline could lead – indeed, invites – any officer to engage in misconduct with impunity.  *See, e.g., Harris*, 489 U.S. at 395; *Gentile*, 926 F.2d at 152; *Carter*, 181 F.3d at 357.

In *Gentile*, 926 F.2d at 152, the Court ruled that municipal liability can be proven with evidence of a persistent pattern of failing to properly supervise and discipline officers:

> Plaintiffs were not obliged to produce particular evidence that defendants had specific knowledge of a declared policy of the County and acted on this knowledge in promoting the malicious prosecution of plaintiffs.  This is only one method – and not the exclusive one – of establishing the necessary link between municipal practice and individual behavior.  The critical question here is whether there is sufficient

---

[12]  Defendants have not submitted any expert reports on the issues of municipal liability.

evidence in the record of municipal policy, custom or practice, so that a jury could reasonably infer that the individual conduct in this case was causally connected to the policy. *See Batista v. Rodriquez*, 702 F.2d 393, 398 (2d Cir. 1983), which states that "a causal connection between the City's policy of inaction and the arrests and assault might permissibly be implied" from "conduct" "such as inadequate training and supervision or prior instances of unusual brutality indicating deliberate indifference or gross negligence on the part of the municipal officials in charge."

As in *Gentile,* the PPD's failure to discipline was so egregious and persistent that any officer could confidently engage in misconduct without fear of punishment.

### C.     State Law Claims

The elements of the state law malicious prosecution claim are the same as those for a § 1983 malicious prosecution claim, absent the requirement of a Fourth Amendment seizure. *See Corrigan v. Central Tax Bureau of Pa., Inc.*, 828 A.2d 502, 505 (Pa. Commw. Ct. 2003). Therefore, for the same reasons each element of his § 1983 malicious prosecution claim has been established, Doswell has a malicious prosecution claim under state law. Again, defendants incorrectly describe Pennsylvania law on the effect of a prior state conviction on the probable cause determination. An overturned conviction "is conclusive proof of the existence of probable cause, *unless the convicted party can show fraud or other undue influences at work in the conviction proceeding.*" *Cosmas v. Bloomingdales Bros., Inc.*, 660 A.2d 83, 86 (Pa. Super. Ct. 1995) (emphasis added) (quoted in *McGriff v. Vidovich*, 699 A.2d 797, 799 (Pa. Commw. Ct. 1997)). The evidence that Wolf deprived Doswell of a fair trial prevents the conviction from having any preclusive effect on plaintiffs' state law malicious prosecution claim.

**IV.     Conclusion**

For all of the foregoing reasons, Defendants' Joint Motion for Summary Judgment should

be denied in full.

Respectfully submitted,

/s/ David Rudovsky
David Rudovsky, Esquire
I.D. No. 15168
Kairys, Rudovsky, Messing & Feinberg
718 Arch Street, Suite 501S
Philadelphia, PA 19106
(215) 925-4400

/s/ Anna Benvenutti Hoffmann
Peter J. Neufeld, Esquire
Anna Benvenutti Hoffmann, Esquire
Cochran, Neufeld & Scheck, LLP
99 Hudson Street
New York, NY 10013
(212) 965-9081

/s/ Timothy O'Brien
Timothy O'Brien, Esquire
I.D. No. 22104
429 Forbes Avenue
Pittsburgh, PA 15219
(412) 232-4400

Counsel for Plaintiffs