IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THOMAS DOSWELL and             )
RAYMOND THOMAS LOWRY,          )
                               )
            Plaintiffs,        )
                               )   Civil Action No. 07-0761
      vs.                      )
                               )
CITY OF PITTSBURGH; DETECTIVE  )
HERMAN WOLF, in his individual )
capacity, JOHN DOE and RICHARD ROE, )
Unknown Police Department Supervisors of )
Defendant Wolf,                )
                Defendants.    )


AMBROSE, Chief District Judge


**OPINION AND
ORDER OF THE COURT**

**<u>Synopsis</u>**

Plaintiffs Thomas Doswell ("Doswell") and his son, Raymond Thomas Lowry ("Lowry"),

assert claims arising from Doswell's conviction for rape in 1986 and his nineteen-year

incarceration for that crime.  In 2005, DNA evidence exonerated Doswell of the crime, his

conviction was vacated and the charges dismissed, and he was released from prison.  He asserts

civil rights claims under section 1983 for malicious prosecution, under the 14th Amendment for

due process violations, under the Eighth Amendment for cruel and unusual punishment and

under Pennsylvania state law for malicious prosecution.  Lowry asserts a claim under the

Fourteenth Amendment for deprivation of his familial and associational rights.  Defendants

Detective Herman Wolf ("Wolf") and the City of Pittsburgh ("City") move for summary

1

judgment dismissing the action in its entirety.  For the reasons set forth below, I grant

Defendants' motion dismissing Doswell's federal and state law claims for malicious prosecution

and Lowry's claim under the Fourteenth Amendment, and deny Defendants' motion in all other

respects.  I also grant in part and deny in part Plaintiffs' companion motion to establish

undisputed facts.

**I.  Standard of Review**

Summary judgment may only be granted if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law.  Fed.R.Civ.P. 56(c).  Rule 56 mandates the entry of summary judgment, after adequate

time for discovery and upon motion, against the party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In considering a motion for summary judgment, this Court must examine the facts in a

light most favorable to the party opposing the motion.  Internat'l Raw Materials, Ltd. v. Stauffer

Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990).  The burden is on the moving party to demonstrate

that the evidence creates no genuine issue of material fact.  Chipollini v. Spencer Gifts, Inc., 814

F.2d 893, 896 (3d Cir. 1987).  The dispute is genuine if the evidence is such that a reasonable

jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986).  A fact is material when it might affect the outcome of the suit under the

governing law.  Id.  Where the non-moving party will bear the burden of proof at trial, the party

moving for summary judgment may meet its burden by showing that the evidentiary materials of

record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial.  Celotex, 477 U.S. at 322.  Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue for trial.  Id. at 324.

## II.  Relevant Factual Background

At approximately six o'clock on the morning of March 13, 1986, Helen Tokar arrived at work at the Forbes Health Center in Pittsburgh, Pennsylvania.  (Defendants' Concise Statement of Material Facts [Docket No. 49], at ¶ 1.)[1]  Ms. Tokar entered the hospital and proceeded to the lunchroom, where an assailant grabbed her and shut and locked the lunchroom door.  (Id. at ¶ 2.) She was forced by the assailant onto the lunchroom floor, where he raped her and demanded oral sex.  (Id. at ¶ 3.)

Ora Jean Bolte was employed at the time by the Forbes Health Center in the laundry department.  (Id. ¶ 37.)  While the assailant was raping Ms. Tokar, Ms. Bolte attempted to enter the lunch room door, which was locked.  (Id.)  Ms. Bolte pounded on the locked door for five to ten minutes.  (Id. at ¶ 38.)  The assailant, after completing the rape, fled the lunch room by unlocking the door, opening it, and then pushing past Ms. Bolte and fleeing the building.  (Id. at ¶ 5.)  Ms. Tokar immediately informed Ms. Bolte that she had been raped, and Ms. Bolte and another co-worker, Chuck Novak, gave chase.  (Id. at ¶6.)  Mr. Novak pursued the assailant for several blocks outside the hospital, but did not catch him.  (Id.)

---

[1]Unless expressly stated otherwise, the facts set forth herein have been admitted by the opposing party.

The Pittsburgh Police Department received a call at approximately 6:15 a.m. reporting the rape. (Id. at ¶ 7.) Uniformed officers from the Zone 5 station, Officers Michael Kondas and Joseph Paieski, responded to the call and interviewed Ms. Tokar. (Id.) Ms. Tokar identifed her assailant as a black man, between five feet, five inches (5'5'') and five feet, nine inches (5'9'') in height, medium complexion, short cut hair, and wearing a gray shirt, beige jacket, blue jeans and tennis shoes. (Id. at ¶ 8.) She also told the officers that she had hit her assailant on the head with a cup, breaking the cup. (Plaintiffs' Response to Defendants' Concise Statement of Material Facts [Docket No. 54], at ¶ 53.)

Fifty minutes after Ms. Tokar was raped, there was an indecent assault five blocks away from Forbes Hospital. The victim in that incident, Ms. Recena Harris, described her assailant as a black male, five feet, six inches (5'6''), with close cut hair and wearing a beige or light brown jacket. (Docket No. 71.) Ms. Harris also told the police that her assailant had something running down the side of his face. (Id.) No report of any follow-up investigation, including any identification procedure conducted with Ms. Harris, could be found in the police department records. (Docket No. 54, at ¶ 56.)

Detectives Defendant Wolf and Ellen Blacksmith of the City of Pittsburgh Sex Assault Squad were assigned to the investigation of the rape. (Docket No. 49, at ¶ 9.) In 1984, several years before the rape of Ms. Tokar, Plaintiff Doswell had been charged with the rape of Ms. Victoria Johnson. (Docket No. 54, at ¶ 71.) According to Doswell, Wolf was the lead detective charged with investigating that rape. (Id.) Doswell was subsequently acquitted of that rape charge. (Id. at ¶ 72.) After Doswell was acquitted, Doswell claims that Wolf threatened to "get him." (Id. at ¶ 102.)

Prior to interviewing Ms. Tokar, and based on a general description of the assailant, Wolf identified Doswell as a suspect. Wolf assembled a photo array of eight suspects to show Ms. Tokar. (See Docket No. 69.) Doswell's photo contained the letter "R" above the date on the photo, in a different font and color than the other writing on the photo and clearly visible. (Id.; Docket No. 54, at ¶ 74.) None of the other photos contained the letter "R". (Docket No. 54, at ¶ 51.) Wolf testified at his deposition that the "R" stood for rape. (Id. at ¶ 76.) The Pittsburgh Police Department used the "R"-designated photo of the individual it considered the main suspect in sexual assault investigations in photo arrays with no other similarly marked photos. (Id. at ¶ 78.) According to Wolf, only one "R"-designated photo was used in a photo array because the purpose of the photo array was to get an identification, and more than one "R" designated suspect might make it difficult to get that identification from the witness or victim. (Docket No. 59, at 36.) At his deposition in connection with this action, Wolf testified that at the time he assembled the photo array for the Tokar rape, he believed the practice of using of an "R" designated photo in photo arrays was unconstitutional, and that he still believes that to be the case. (Id. at 24, 29.)

At approximately 9:15 a.m., Wolf interviewed Ms. Tokar at Shadyside Hospital. (Docket No. 49, at ¶ 10.)[2] During the interview, Ms. Tokar told Wolf that her assailant had "some kind of whisker growth on his face." (Docket No. 54, at ¶ 59.) Ms. Tokar was then shown the photo array assembled by Wolf and she positively identified photo 120899, the photo of Doswell, as her assailant. (Docket No. 49, at ¶ 12.) As of May 14, 2008, the date of her deposition in this action, Ms. Tokar maintains that her identification of Doswell was correct. (Id. at ¶ 18.)

_____

[2]The parties dispute whether Detective Blacksmith was also present.

According to Wolf's supplemental report, Wolf then interviewed a witness, Ms. Bolte, at Forbes Hospital, who informed Wolf that she had seen the assailant and picked Doswell's photo from the same array Wolf had shown to Ms. Tokar. (Docket No. 72, at 2.) Mr. Novack, who had chased the assailant for several blocks, also was interviewed, but stated that he had never seen the assailant's face. (Id. at 3.)

That afternoon, plainclothes officer Thomas Derico ("Derico") arrested Doswell at the home of Sheila Lowry, his girlfriend. (Docket No. 72.) According to Derico's affidavit, submitted in connection with this action, Doswell answered the door in his boxer shorts and looked like he had just gotten out of bed. (Docket No. 57, at ¶ 4.) Derico had been informed by unidentified "others" in the police department that the perpetrator was expected to have a mark on his head where the victim had hit him with a cup. (Id. at ¶5.) Derico examined Doswell's head for any cuts, bruises, bumps or other marks, and found none. (Id.) Further, Derico knew Doswell from his assignment in the Homewood neighborhood of Pittsburgh, and had observed Doswell consistently wearing a neck brace in the days and weeks prior to Ms. Tokar's rape. (Id. at ¶ 7.)

Wolf interviewed Doswell at the police station. According to Wolf's report, Doswell initially informed Wolf that he had spent the night at his mother's house, in the company of Sheila Lowry (his girlfriend), Ramon (sic) (his four-year-old son), Olivia Doswell (his mother), Tracy Doswell (his sister) and Toby Spearman (a friend). (Docket No. 72, at 4.) Doswell then stated that he actually was at Sheila Lowry's house the entire time, with his son, from approximately 9 p.m. on Wednesday until he was picked up by Derico on Thursday afternoon.

Ms. Lowry had left the house around midnight on Wednesday night. (Id.)[3]  Wolf did not take

photographs of Doswell's head at the time of his arrest.  (Docket No. 54, at ¶ 89.)

Prior to Doswell's trial, Doswell's attorney, Carl Marcus, Esq., made a motion before

Judge David Cercone to suppress the eyewitness identification, on the grounds that the photo

array was suggestive, and that the suggestive photo array tainted the subsequent witness

identification at the preliminary hearing.  (Docket No. 49, at ¶ 19; Docket No. 50-14, at 2.)  Wolf

testified for the Commonwealth and was the only witness called.  (Id. at ¶ 20.)  Judge Cercone

held that probable cause, in the form of the eyewitness identification, did exist to arrest Doswell.

(Docket No. 50-14, at 9.)  He further held that the photo array was not suggestive, in that the

photos depicted individuals of basically the same age, race, hairstyle and facial features, the

number of photos shown was sufficient, and that the "R" on Doswell's photo was not unduly

suggestive.  (Id.)  Judge Cercone denied the motion to suppress.  (Id. at 9-10.)

A trial was held beginning on November 19, 1986.  (Docket No. 50-8, at 2.)  Both Ms.

Tokar and Ms. Bolte identified Doswell as the rapist.  (Docket No. 49, at ¶¶ 18, 39.)  Wolf

testified that Doswell had a mark on his forehead at the time of his arrest, was recently shaven,

that Doswell changed part of his alibi during interrogation, and that the neck brace Doswell was

wearing at his preliminary hearing appeared brand new.  (Docket No. 68, at 2, 12, 16, 17.)  A jury

convicted Doswell of rape, involuntary deviate sexual intercourse, terroristic threats and unlawful

---

[3]Wolf interviewed Ms. Lowry on March 17, 1986.  (Docket No. 72, at 6.)  Ms. Lowry's
statement contradicted Doswell, in that she stated that several other individuals were at the house
on Wednesday night, that Doswell was still awake playing dominos with them at 4 a.m. and that
he was asleep on the sofa when she left at 6 a.m. (Id.)  Ms. Lowry's statement was substantially
confirmed by Doswell's sister in a statement taken by Wolf on March 20, 1986.  (Docket No. 72,
at 8.)

restraint.  (Docket No. 50-8, at 2.)  He was sentenced to thirteen to twenty-six years.  (Id.)  On appeal from his judgment of sentence, the Superior Court affirmed the judgment and held that the trial court did not err in failing to suppress the identification of Doswell based on the photo array.  (Id. at 8.)

On May 4, 2005, Judge John Zottola ordered DNA testing on the sexual assault kit taken from Ms. Tokar, as well as on a reference sample obtained from Doswell.  (Docket No. 56, at ¶ 6.)  The Allegheny County Crime Laboratory conducted the DNA testing and concluded that Doswell was not the source of the sperm or semen contained in the sexual assault kit.  (Id. at ¶ 8.)  As a result of these tests, the Allegheny County District Attorney's Office and Doswell's lawyers jointly moved to vacate Doswell's conviction.  (Id.)  The court granted the motion, the conviction was vacated and all charges against him were dismissed.  (Id. at ¶ 10.)

In 2006, Ms. Bolte submitted an affidavit in connection with Doswell's exoneration.  (Docket No. 50-11.)  In her affidavit, Ms. Bolte states that she only saw the assailant for a few seconds and would not have been able to identify him.  (Id. at ¶ 2.)  Ms. Bolte further states that she told Wolf later that day, during her interview, that she could not identify the assailant, but that Wolf kept pointing to Doswell's picture in the photo array and saying "something like, 'this is the one'." (Id. at ¶3.)  She later told a private investigator working for Doswell that she could not identify the assailant.  (Id. at ¶ 4.)  Ms. Bolte stated that, sometime after she spoke with the investigator, Wolf came to see her at the hospital, that he was angry, frightened her, and told her not to tell anyone that she could not identify the assailant.  (Id. at ¶6.)  Wolf drove Ms. Bolte to the courthouse on the day of Doswell's trial and told her to testify that she saw the assailant and to identify Doswell as such.  (Id.).  According to Ms. Bolte, "[t]he only reason I picked [Doswell]

out in the courtroom is because Detective Wolf told me to and I was afraid of him." (Id. at ¶ 7.)

## III. Defendants' Motion for Summary Judgment

### A. Malicious Prosecution

Doswell's malicious prosecution claim is premised on what he characterizes as an unduly suggestive photo array, and exculpatory evidence that was not provided to the judge (Pl. Opp. Br. at 14-15.) To establish a section 1983 claim for malicious prosecution, a plaintiff must demonstrate that: (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. Johnson v. Knorr, 477 F.3d 75, 81-82 (3d Cir. 2007). In section 1983 malicious prosecution actions, the threshold issue is the existence of probable cause. Lee v. Mihalich, 847 F.2d 66, 70 (3d Cir. 1988). Defendants' seek dismissal of Doswell's claim for malicious prosecution on the ground that probable cause existed to initiate the criminal proceeding, both from an objective standpoint and as a matter that was determined by the state criminal court proceedings. (Def. Br. at 10-13.)

As set forth in detail above, Doswell's attorney in the criminal proceeding moved to suppress the photo array identification of Doswell, arguing that the photo array was unduly suggestive since only Doswell was designated by an "R"on his photo, and he was the only person wearing a skimpy tank top. Doswell's attorney further argued that all subsequent identifications of Doswell by the victim were tainted by the suggestive photo array, and should also be suppressed. Judge Cercone held a suppression hearing, during which he viewed the photo array,

Defendant Wolf testified, and Doswell was represented by counsel who cross-examined Wolf. There is no indication in the record that Doswell's attorney was not provided an opportunity to call his own witness or that the adversarial process was otherwise compromised, and Plaintiff does not make that argument herein. At the conclusion of the hearing, Judge Cercone held:

> This Court finds after hearing and consideration of argument of counsel, that probable cause did exist. The basis for the probable cause is the selection of the defendant's picture from the photo array that was presented. The Court finds that the photo array was not unduly suggestive.
>
> The factors that the Court is considering in making that determination are this: The photos shown are of individuals basically of the same age, race, hairstyle, facial features, plus the number of photos that were presented were sufficient to render the photo array acceptable.
>
> The problem with the R – I find that although it is worthy of consideration by the Court, that after thinking about it I don't believe that it was unduly suggestive. I am not saying it is the best practice in the world, but just to have the letter R on the plate which also contains other numbers - approximately twelve numbers or so on the plate - there is no evidence that the victim would have had any background or any other knowledge that would give her an idea of what the R would stand for and that in and of itself they are - in and of itself was unduly suggestive.
>
> Therefore, I do find that the photo array was not unduly suggestive and, therefore, any other identifications that were made subsequently such as at the preliminary hearing were also not tainted.

[Docket No. 50-14, at 30-31.] This issue was appealed by Doswell to the Superior Court of Pennsylvania, which held that "the victim's detailed description and photographic identification of appellant were sufficient to establish probable cause." [Docket No. 50-9, at 6.] Likewise, the Superior Court upheld the Commonwealth Court's finding that suppression was not warranted.

> In the case at hand, the attack upon the victim lasted fifteen minutes in a well-lighted area. The victim's initial description of appellant corresponded with his actual appearance. The time lapse between the attack and the victim's selection of appellant's photograph was minimal. Finally, the victim's certainty regarding her identification of appellant as the assailant never wavered. We therefore find that

the trial court was correct in declining to suppress the photographic identification of appellant.

[Id. at 8.]

"Collateral estoppel, or issue preclusion, prevents a party who litigated an issue previously from rearguing that particular issue even if the other litigants were not a party to the earlier proceeding." James v. Heritage Valley Fed. Credit Union, 197 Fed.Appx. 102, 105 (3d Cir. 2006), cert. denied, 127 S.Ct. 2253 (2007). The United States Supreme Court has upheld the applicability of collateral estoppel to actions brought pursuant to section 1983. Allen v. McCurry, 449 U.S. 90, 105 (1980). Thus, "[a] finding in a prior criminal proceeding may estop an individual from litigating the same issue in a subsequent civil proceeding." James, 197 Fed.Appx. at 105. Federal courts in this Circuit have repeatedly held that probable cause determinations at state court suppression hearings are binding on federal courts in subsequent civil rights actions. See, e.g., Ashford v. Skiles, 837 F. Supp. 108, 112 (E.D. Pa. 1993) ("A finding of probable cause made in a state court suppression hearing may be an appropriate basis for application of the doctrine of issue preclusion to a § 1983 claim."); Carter v. Three Unknown Police Officers of the Wilmington Police Dep't, 619 F. Supp. 1253, 1258 (D. Del. 1985) (issue preclusion applies to civil rights claim based on probable cause determination in state court criminal suppression hearing); Sesso v. Rapone, 537 F. Supp. 1091, 1093 (E.D. Pa. 1982) (plaintiff in civil rights action precluded from arguing that line-up procedure was unduly suggestive where issue had been litigated and decided adversely to the plaintiff in a state court criminal suppression hearing); c.f. Brookins v. City of Pittsburgh, 2009 WL 874768, at *3 (W.D. Pa. Mar. 27, 2009) (issue preclusion bars relitigation in civil rights action of excessive force

determination made in state criminal trial).  Moreover, even an incorrect determination of

probable cause is binding on federal courts.  <u>Carter</u>, 619 F. Supp. at 1260 (citing <u>U.S. <em>ex rel.</em></u>

<u>Hickey v. Jeffes</u>, 571 F.2d 762 (3d Cir. 1978)).

In determining whether issue preclusion applies to bar a federal court from revisiting an

issue previously determined in state court, a federal court must give the state court's judgment

the same preclusive effect as would be given the judgment by a court of that state.  <u>James</u>, 197

Fed.Appx. at 105.  "Under Pennsylvania law, the elements of collateral estoppel are: (1) the issue

was identical to the one presented in the later action; (2) there was a final judgment on the merits;

(3) the party against whom the plea is asserted was a party or in privity with a party to the prior

adjudication; and (4) the party against whom it is asserted had a full and fair opportunity to

litigate the issue in question in a prior action."  <u>Id.</u>

The issue of probable cause meets all of these criteria.  The suggestiveness of the photo

array and the validity of probable cause stemming from the witness identification of Doswell

were litigated both at the state trial level and upheld on appeal.  Doswell was a party to the

criminal proceeding, was represented by counsel and had the opportunity to present his

arguments and cross-examine witnesses.  Accordingly, I am bound by the Commonwealth and

Superior Court's finding that probable cause to initiate the criminal proceedings against Doswell

existed.

Plaintiff relies on the Third Circuit's opinion in <u>Montgomery v. De Simone, PTL</u>, 159

F.3d 120 (3d Cir. 1998) for the proposition that, since Doswell's conviction was vacated, the

findings of the state criminal court cannot have preclusive effect.  I find <u>Montgomery</u> to be

distinguishable from the case at bar.[4]

In <u>Montgomery</u>, the plaintiff was arrested for drunk driving. Based upon the arresting officer's testimony, the municipal court judge found that there was probable cause for the officer to stop the plaintiff's car and to arrest her for drunk driving. 159 F.3d at 123. After hearing all the testimony, the municipal court judge found the plaintiff guilty of speeding, drunk driving, and refusing to take a breathalyzer test. <u>Id.</u> The plaintiff appealed the conviction and the New Jersey Superior Court held a trial *de novo*. The Superior Court reversed the conviction, expressing doubt that the plaintiff had been speeding or that the officer had reason to believe that the plaintiff was drunk at the time of the stop. <u>Id.</u> The plaintiff then commenced an action in the District Court for the District of New Jersey alleging, *inter alia*, malicious prosecution under section 1983.

The District Court granted summary judgment dismissing the plaintiff's malicious prosecution claim "based upon the premise that the municipal judge's finding of probable cause for her arrest negated any possibility that [plaintiff] could establish an absence of probable cause for purposes of her section 1983 malicious prosecution claim." <u>Id.</u> at 124. The Third Circuit reversed, holding that "the Restatement's rule that an overturned municipal conviction presumptively establish probable cause contravenes the policies underlying the Civil Rights Act and therefore does not apply to a section 1983 malicious prosecution action." <u>Id.</u> at 125. It further explained that "[a]pplying a presumption of probable cause in a section 1983 action on

---

[4]Plaintiff also relies on <u>Stolt-Nielsen, S.A. v. United States</u>, 442 F.3d 177, 187 n.7 (3d Cir.), <u>cert. denied</u>, 549 U.S. 1015 (2006). In <u>Stolt-Nielson</u>, the Third Circuit noted that the decision of a district court that has been reversed lacks preclusive effect as to those parties. The decision did not address the preclusive effect of state criminal decisions on subsequent civil rights action, and is thus inapposite.

the sole basis of a municipal conviction that has been overturned undermines one of the Civil Right Act's *raisons d'etre, i.e.*, to interpose the federal courts, as guardians of federal rights, between the authority of the states and the people." Id.

Thus, in Montgomery, the Third Circuit refused to permit a presumption of probable cause based solely on the municipal court conviction where that conviction was subsequently vacated by the Superior Court. Notably, the Superior Court in Montgomery reversed both the conviction and cast doubt on the finding of probable cause itself. Here, however, Doswell's conviction was vacated on other grounds - DNA evidence that was not available at the time of his conviction. The probable cause determination of the trial court and its affirmation by the Superior Court were in no way implicated by this new evidence. Nor is this a case where a presumption of probable cause stems solely from the fact of the criminal conviction. Rather, it was expressly held by the trial court and affirmed by the Superior Court that the photo array established probable cause to arrest Doswell.

The case law relating to the preclusive effect of suppression hearings in civil rights actions has not been overruled or even questioned. Reading Montgomery and its progeny, I do not believe that the Third Circuit intended to obliterate the underlying legal holdings in all overturned or vacated criminal cases, regardless of the basis on which the convictions were vacated. To so apply Montgomery would cast federal district courts in the role of second-guessing established state criminal law holdings. As the Supreme Court noted in Allen, it has repeatedly expressed its confidence in the ability of state courts to uphold federal constitutional law. 449 U.S. at 105.

Accordingly, since probable cause to arrest Doswell existed, as determined by the state

courts of Pennsylvania, I must grant summary judgment dismissing Plaintiff's claim for malicious prosecution.[5]

## B. Due Process Violation

Doswell asserts a claim under section 1983 alleging that a state actor, here, Wolf, interfered with Doswell's right to a fair trial. (Pl. Opp. Br. at 9.) Doswell's claim is premised on the following conduct by Wolf:

- Wolf was biased against Doswell before the case began and made Doswell the sole suspect in the photo array;

- Wolf used a suggestive photo array;

- Wolf engaged in suggestive conduct during his interactions with Tokar to ensure that she identified Doswelll;

- Wolf pressured and threatened Bolte into identifying Doswell as the assailant;

- Wolf fabricated evidence that Doswell had an injury to his head at the time of his arrest, was freshly shaven, and testified that Doswell presented a false alibi and pretended to have a debilitating neck injury at the time of the crime;

- Wolf failed to investigate a related case committed less than an hour later and/or covered up exclupatory evidence revealed in any investigation of that case; and

- Wolf failed to reveal any of his conduct to the prosecutor.

(Pl. Opp. Br. at 10.).

"A defendant has a due process right to a fair trial. Government agents may not

---

[5]Because Plaintiff's state law claim for malicious prosecution also requires a showing of lack of probable cause, I grant summary judgment dismissing that claim on the same basis as the federal claim.

manufacture evidence and offer it against a criminal defendant." Stepp v. Mangold, 1998 WL 309921, at *7 (E.D. Pa. June 10, 1998) ; see also, Laughman v. Pennsylvania, 2007 WL 2345295, at *8 (M.D. Pa. Aug. 16, 2007) (manufacture of false evidence states a claim under substantive due process).  Similarly, "police officers and other state actors may be liable under § 1983 for failing to disclose exculpatory evidence to the prosecutor."  Yarris v. County of Delaware, 465 F.3d 129, 141 (3d Cir. 2006) (quotations omitted).  As the Third Circuit further explained:

> it would be anomalous to say that police officers are not liable when they affirmatively conceal material evidence from the prosecutor.  In this case [the plaintiff] alleges that the Troopers suppressed the extent of their impermissible law enforcement tactics, and had that information been available, he would have been able to impeach several witnesses and possibly could have halted the entire prosecution.  We think that [the Plaintiff] states an actionable § 1983 claim against the Troopers for interference with his Fourteenth Amendment due process rights.

Gibson v. Superintendent of New Jersey Dep't of Law and Public Safety - Div. of State Police, 411 F.3d 427, 443 (3d Cir. 2005), cert. denied sub nom, Verniero v. Gibson, 547 U.S. 1035 (2006).

I recognize that this is not a motion to dismiss, but a motion for summary judgment. Defendants argue that a careful review of the record establishes that Doswell did receive a fair trial, even if later DNA technology proved that he did not commit the crime.  (Def. Br. at 23.)  As stated in section I above, in opposing the motion for summary judgment, Plaintiff must go beyond its allegations and point to specific facts in the record showing there is a genuine issue for trial.

After a comprehensive review of the record, I find that Doswell has met his burden in this

respect. Doswell testified during his deposition that Wolf had threatened to 'get him' after he was acquitted of the prior sexual assault charge. Doswell's assertion is supported by Wolf's having selected Doswell as the suspect to be presented in the photo array, based on a very general description of the assailant and prior to interviewing Ms. Tokar himself. While Ms. Tokar identified Doswell as her assailant, and no evidence in the record seems to support Doswell's allegation that Wolf engaged in suggestive conduct during his interactions with Ms. Tokar, other conduct by Wolf casts doubt on the fairness of trial. For instance, Ms. Bolte has stated in an affidavit that Wolfe coerced and threatened her into identifying Doswell as the assailant, both before and during the trial. Wolf also may have concealed from prosecutors, or affirmatively misrepresented to them, whether Doswell had an injury to his head at the time of his arrest, whether he was freshly shaven, whether he gave police a false alibi and whether he was pretending to have a debilitating neck injury at the time of the crime.[6] Absent this additional evidence against Doswell, all that would have remained for the criminal trial was Ms. Tokar's identification under possibly suggestive circumstances.[7] While the evidence before me does not conclusively establish Wolf's misconduct, it is sufficient to raise a genuine issue of material fact as to whether Doswell received the fair trial to which he was entitled under the Fourteenth Amendment.

---

[6] The arresting officer, Derico, submitted a declaration, dated July 19, 2008, stating that he examined Doswell's head at the time of the arrest and did not observe any injuries. He further stated that he knew Doswell from his patrols of the neighborhood and had previously observed him wearing a neck brace. [Docket No. 57.]

[7] While the suggestiveness of the photo array was not sufficient to prevent a finding of probable cause, Judge Cercone did permit counsel for Doswell to argue to the jury at the criminal trial that the presence of the 'R' on Doswell's photo undermined the weight to be accorded to Ms. Tokar's identification of Doswell as the assailant.

### C. Qualified Immunity

"Qualified immunity shields state officials from suit when their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Yarris</u>, 465 F.3d at 140 (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  In determining whether an individual is entitled to qualified immunity, courts apply a two-step analysis.  "First, the court must determine whether the facts alleged show that the defendant's conduct violated a constitutional or statutory right." <u>Id.</u> at 140-41 (citing <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001)).  "If so, the court must then determine whether the constitutional or statutory right allegedly violated was 'clearly established' at the time the violation occurred." <u>Id.</u> at 141.  "If the court concludes that the defendant's conduct violated a clearly established constitutional or statutory right, it must deny the defendant the protection afforded by qualified immunity." <u>Id.</u>

Here, I have already determined in Part B above that the evidence before me raises an issue of fact as to whether Defendants violated Doswell's right to a fair trial.  Accordingly, all that is left for me to determine is whether that right was clearly established at the time.

### 1.    Defendant Wolf

Defendants argue that Wolf is immune from liability because (1) Doswell has failed to demonstrate a constitutional violation; and (2) even if he had, Wolf could not have known at the time that the use of 'R'-designated photo for identification violated Doswell's rights.  I have already rejected Defendants' first argument.  As to Defendants' second argument, it fails because it ignores the full spectrum of Wolf's conduct at issue.

It was well-established at the time of Doswell's criminal trial that a criminal conviction

obtained by the use of false evidence violates the criminal defendant's constitutional rights. See

Miller v. Pate, 386 U.S. 1, 7 (1967) ("More than 30 years ago this Court held that the Fourteenth

Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false

evidence. There has been no deviation from that established principle."). As the District Court

for the Middle District of Pennsylvania further explained:

> the right to be free from falsifying documents, fabricating evidence, giving
> misleading or perjured testimony, and malicious prosecution was clearly
> established. It strains credibility to think that police officers could participate in
> the conduct alleged here and not understand that their actions violate the
> accused's rights. It is up to Plaintiff to prove by a preponderance of the evidence
> at trial that the individuals did in fact conspire to alter evidence in order to convict
> him and are responsible for his imprisonment. At summary judgment, taking the
> facts in the light most favorable to Plaintiff, the individual Defendants have failed
> to meet their burden in demonstrating immunity for the violations claimed.

Crawford, 2005 WL 2465863, at *10.

The same reasoning applies herein. Defendant Wolf's conduct involved much more than

showing an arguably suggestive photo array to the victim. Taking the facts in the light most

favorable to Doswell, Defendant Wolf provided misleading information to the prosecutors

regarding Doswell's facial hair, his alibi, the injury to his neck, and his lack of head injury. Wolf

also coerced Ms. Tokar, a key witness, into identifying Doswell as the assailant. Defendants are

correct that Wolf is immune from liability under section 1983 for his testimony at trial. See

Briscoe v. LaHue, 460 U.S. 325 (1983); Williams v. Hepting, 844 F.2d 138, 143 (3d Cir.)

(extending immunity to officer's testimony at preliminary hearings and suppression hearings),

cert. denied, 488 U.S. 851 (1988). He is not, however, immune from liability based on his failure

to provide accurate and relevant information to the prosecutors, or from engaging in coercive

conduct and failing to inform prosecutors of his misconduct. Accordingly, I find that Wolf is not

entitled to qualified immunity.

## 2. City of Pittsburgh

"Under 42 U.S.C. § 1983, municipal defendants cannot be held liable under a theory of respondeat superior; municipal liability only arises when a constitutional deprivation results from an official custom or policy." Montgomery v. De Simone, 159 F.3d 120, 126 (3d Cir. 1998) (citing Monell v. Dep't of Social Svcs. of City of N.Y., 436 U.S. 658, 691-94 (1978)).

> A government policy or custom can be established in two ways. Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict. A course of conduct is considered to be a custom when, though not authorized by law, such practices of state officials are so permanent and well-settled as to virtually constitute law.

Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990)) (internal quotations omitted), cert. denied, 519 U.S. 1151 (1997). Custom may also be established by evidence of knowledge and acquiescence. Id. Moreover, "[t]he plaintiff must show that the official custom or policy caused the deprivation of a constitutionally-protected right and the policy or custom must be the 'moving force' behind the constitutional tort. Cannon v. City of Philadelphia, 86 F. Supp.2d 460, 472 (E.D. Pa. 2000), aff'd, 261 F.3d 490 (3d Cir.), cert. denied, 534 U.S. 893 (2001).

Doswell argues that the City of Pittsburgh failed to train and supervise its police officers with respect to proper identification procedures with witnesses and how to conduct a fair and impartial criminal investigation, including the duty to preserve and disclose exculpatory evidence. (Pl. Br. at 24-26.) Doswell further argues that the City's disciplinary system failed to punish misconduct or even to convey to police officers that they would be subject to discipline

for misconduct in these areas.  (Pl. Br. at 26-28.)

The "inadequacy of police training may serve as the basis for § 1983 liability 'only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.'" Beck, 89 F.3d at 971-91 (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)).  The plaintiff must show "both contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate." Montgomery, 159 F.3d at 127.  However, "[a] single constitutional violation can still provide the basis for municipal liability for failure to train, but only where the 'need for more or different training is so obvious and the inadequacy so likely to result in the violation of constitutional rights' that the policymakers inaction amounts to deliberate indifference.  Christopher v. Nestlerode, 2007 WL 1839822, at * 7 (3d Cir. June 28, 2007) (quoting City of Canton v. Harris, 489 U.S. 378, 391 (1989)).

Doswell has provided no evidence that the City had knowledge of a prior pattern of incidents similar to the allegations against Wolf herein.  Doswell does have significance evidence that Wolf received no formal training with respect to any aspect of his detective work.  According to Wolf, at the police academy, he received instruction only on "traffic control." (Docket No. 59, at 17.)  As Wolf himself testified, he learned his job by "going out on the street and getting the school of hard knocks." (Id., at 5.)  He learned  how to interrogate prisoners, how to conduct line-ups and photo identification procedures from watching other detectives.  (Id. at 7, 10-11; Docket No. 64, at 3.)  The police department had no rule regarding recusal of police officers in the case of bias or conflict of interest, and no training was provided on an

investigating officer's <u>Brady</u> obligations or duty to turn over exculpatory evidence. (<u>Id.</u> at 18, 22.) There is no evidence in the record that police officers received any specific training at all on the constraints set forth on their work by the U.S. Constitution.

On top of the highly deficient training it provided to its police force, the Pittsburgh Police Department had, at best, a cursory system of supervision and investigation of police misconduct. Prior to 1986, the police department's internal affairs division was responsible for investigating claims of police misconduct. (See Docket No. 75.) In response to Plaintiffs' discovery requests, the police department produced thirty-seven internal investigation files relating to civilian complaints. After reviewing those files, and other materials produced during discovery, Plaintiffs' expert, Dr. Paul McCauley, reached the following conclusions, *inter alia*:

- the files demonstrated "a pattern of police administrative/managerial conduct that makes the internal investigation, disciplinary, and training functions virtually meaningless" (Docket No. 75, at 12);

- "Findings of NOT SUSTAINED without appropriate factual analysis were frequent. The findings were based on opinions of the investigator without a factual analysis." (<u>Id.</u> at 13.);

- "Not one case recommended discipline greater than a reprimand." (<u>Id.</u>);

- "no statistical analyses were conducted of the disciplinary system from 1983-2000 and no audits or reviews were conducted of the OPR/police complaint and investigation process prior to 1996. Simply, this means that the PPD had no way of knowing how many citizen complaints were filed against officers, which officers had more than 2 or 5 or 10 complaints, or what the complaints were about (<u>Id.</u> at 16);

- "As a result, field operations, including criminal investigations and criminal investigators were not held accountable. Under these conditions where officers knew they would not be held accountable for operational misconduct (unless they wrecked a police car) allegations of police abuses more likely than not would not be sustained. Such organizational circumstances create an environment where unlawful and corrupt police activities can take root and jeopardize the integrity of the PPD and the community (Id. at 21).

Given the lack of training provided to police officers, including Wolf, and given the near complete lack of oversight of the actions and misconduct of police officers, I find that Doswell presented sufficient evidence from which a reasonable jury could conclude that the City of Pittsburgh acted with deliberate indifference with respect to the constitutional rights of its citizens, and that such indifference resulted in the injury to Doswell. Accordingly, I deny the City's motion for summary judgment on this issue.

### C. Eighth Amendment Cruel and Unusual Punishment

Doswell's claim under the Eighth Amendment alleges that "it is cruel and unusual punishment for an innocent person to be incarcerated due to the violation of his rights to a fair trial and by means of a malicious prosecution." (Pl. Opp. Br. at 19.) In response, (Def. Br. at 27), Defendants argue that the Eighth Amendment is only applicable to prison officials and cite to a Sixth Circuit case applying the Eighth Amendment in a conditions of confinement context. See Spencer v. Bochard, 449 F.3d 721 (6th Cir. 2006).

I found no case law applying the Eighth Amendment to a situation where a plaintiff was incarcerated as a result of the unconstitutional actions of the defendants. The Supreme Court has

explained that "[t]oday the Eighth Amendment prohibits punishments which, although not physically barbarous, involve the unnecessary and wanton infliction of pain, or are grossly disproportionate to the severity of the crime." Rhodes v. Champan, 452 U.S. 337, 346 (1981) (internal quotations omitted). "One class of unnecessary and wanton wrongs. . .is those wrongs totally without penological justification." Id. at 346 (internal quotations omitted). The Third Circuit has applied this standard to hold that " [s]ubjecting a prisoner to detention beyond the termination of his sentence [violates] the eighth amendment's proscription against cruel and unusual punishment." Moore v. Tartler, 986 F.2d 682, 686 (3d Cir. 1993); Sample v. Diecks, 885 F.2d 1099, 11109-10 (3d Cir. 1989). In order to establish liability under section 1983 for incarceration without penological justification, a plaintiff must demonstrate: (1) "a prison official had knowledge of the prison's problem and thus the risk that unwarranted punishment was being, or would be inflicted"; (2) the official "either failed to act or took only ineffectual action under the circumstances, indicating that his response to the problem was a product of deliberate indifference to the prisoner's plight"; and (3) that there was "a causal connection between the official's response to the problem and the unjustified detention." Moore, 986 F.2d at 686.

I find this case law analogous to the situation herein. As there is no penological justification for continuing to hold a prisoner who has served his term, there can be no penological justification for imprisoning a person who was not guilty of the crime. Further, where the conviction and incarceration stemmed from a violation of the person's constitutional rights, I find that the incarceration does implicate the Eighth Amendment.

In refusing to grant summary judgment dismissing Doswell's right to a fair trial claim, I found that issues of fact exist as to whether Detective Wolf's actions violated Doswell's right to

a fair trial, and whether the City acted with deliberate indifference to that violation.  For those

same reasons, I deny summary judgment dismissing Doswell's claim under the Eighth

Amendment.

### D.  Right to Familial Association

Plaintiff Raymond Lowry argues that "[a] reasonable jury could find that Wolf violated

Lowry's due process rights by causing the wrongful conviction and 19-year incarceration of his

father."  (Pl. Opp. Br. at 20.)  Based upon the briefs of the parties, as well as my own research, it

does not appear that the Third Circuit has addressed the issue of whether a minor child has a

protectible Fourteenth Amendment familial and associational right in the support, companionship

and parenting of his father.  However, numerous circuits have interpreted this right to extend to a

child's right to association with his parent(s).  See, e.g., Pittsley v. Warish, 927 F.2d 3, 8 (1st

Cir.), cert. denied, 502 U.S. 879 (1991) (minor children can not recover for loss of association

with a parent under 1983 unless the state action was "directly aimed at the parent-child

relationship"); Patel v. Searles, 305 F.3d 130, 136 (2d Cir. 2002) (holding that the relationship

between plaintiff and his father is a constitutionally protected familial association), cert. denied,

538 U.S. 907 (2003); Hodge v. Jones, 31 F.3d 157, 163 (4th Cir.) (substantive due process is

implicated in actions that "sever, alter or  otherwise affect parent-child relationships"), cert.

denied, 513 U.S. 1018 (1994); Wooley v. City of Baton Rouge, 211 F.3d 913, 919-20 (5th Cir.

2000) ("a child's right to family integrity is concomitant to that of a parent"); Curnow by and

through Curnow v. Ridgecrest Police, 952 F. 2d 321, 325 (9th Cir. 1991) ("child's interest in her

relationship with a parent is sufficiently weighty by itself to constitute a cognizable liberty

interest"); Lowery v. County of Riley, 522 F.3d 1086, 1092 (10th Cir. 2008) ("A child has a

constitutionally protected liberty interest in a relationship with her parent."); Franz. v. United States, 707 F. 2d 582, 595 (D.C. Cir. 1983) ("Among the most important of the liberties accorded this special treatment is the freedom of a parent and child to maintain, cultivate, and mold their ongoing relationship."); see also, Mayo v. Lane, 867 F.2d 374, 375 (7th Cir. 1989) ("The concept of liberty in the Fourteenth Amendment has been held to embrace a right to associate with one's relatives.")  Defendants have provided no rationale for why the Third Circuit would not similarly hold.  Accordingly, I am inclined to find that Lowry did have an associational right in the companionship and support of his father, Doswell.

As the Third Circuit has emphasized, however, "the Due Process Clause does not condemn every conceivable state action that affects a fundamental right in any way." McCurdy v. Dodd, 352 F.3d 820, 827 (3d Cir. 2003).  Rather, "the due process guarantee has historically been applied only to '*deliberate* decisions of governmental officials to deprive a person of life, liberty or property.'" Id. (emphasis in original) (quoting Daniels v. Williams, 474 U.S. 327, 331 (1986)).  As I noted in my prior decision on this issue [Docket No. 16, at 10], "[i]n the context of parental liberty interests, this limitation means that the Due Process Clause only protects against deliberate violations of a parent's fundamental right - that is, where the state action at issue was specifically aimed at interfering with protected aspects of the parent-child relationship." McCurdy, 352 F.3d at 827-28; see also, K.K. v. Weeks, 2007 WL 1455888, at *10 (M.D. Pa. May 15, 2007) (dismissing due process claims brought by parents individually and on behalf of minor children where evidence did not demonstrate that the defendant deliberately targeted the parent-child relationship).

While, once again, this issue has not been addressed by the Third Circuit in the context of a child's associational rights, Lowry has provided me with no legal argument for why such a requirement should not be extended to that context. Since I have extended the rights set forth in <u>McCurdy</u> to include the rights of minor children, I also feel obliged to extend <u>McCurdy</u>'s requirement that the state actions at issue deliberately target the parent-child relationship.

Here, apart from Wolf's admitted knowledge that he knew Doswell had a son, there is no evidence that his actions were in any manner directed toward Doswell's relationship with Lowry. While it may have had a incidental or indirect effect on Lowry's relationship with Doswell, this is not adequate to permit Lowry's claim to proceed. Accordingly, I grant Defendants' motion for summary judgment dismissing Lowry's 14th Amendment claim.

## IV. Defendants' Motion to Establish Undisputed Facts

Plaintiffs have moved pursuant to Rule 56(d) for the court to make a determination as to those material facts not genuinely at issue. (Docket No. 81.) Specifically, Plaintiffs ask me to declare that the facts alleged in paragraphs 49 through 101 of their Statement of Material Undisputed Facts (Docket No. 54) have been established by the record before me.

Rule 56(d) states that such a determination should be made "to the extent practicable." In Defendants' response to this motion (Docket No. 84], Defendants have deemed certain facts "admitted." Given the parties concurrence on these facts, I hold that the facts alleged in paragraphs 49, 50, 59, 61 and 75 set forth in Docket No. 54 are not genuinely in dispute. The remainder of the facts are either in dispute, or the wording chosen by Plaintiffs has rendered them so.

I agree, as Plaintiffs' argue, that a prior determination of undisputed facts would streamline the trial and save the parties and the court time and expense. In that spirit, I encourage the parties to work together to submit a Stipulation of Facts or serve Requests for Admissions prior to trial.

## CONCLUSION

Accordingly, the Defendants' motion for summary judgment is GRANTED to the extent of dismissing Doswell's federal and state claims for malicious prosecution and Lowry's claim under the Fourteenth Amendment. Defendants' motion for summary judgment is DENIED in all other respects. Plaintiff's motion to establish undisputed facts is GRANTED in part and DENIED in part, as set forth in the Opinion and accompanying Order.

## ORDER OF THE COURT

AND NOW, this 16th day of June, 2009, after careful consideration, and for the reasons set forth in the accompanying Opinion, it is hereby ORDERED that:

(1) Defendants' motion for summary judgment [Docket No. 47] is GRANTED dismissing Doswell's federal and state law claims for malicious prosecution and Lowry's claim under the Fourteenth Amendment; and

(2) DENIED in all other respects; and it is further ORDERED that:

(3) Plaintiffs' motion to establish undisputed facts [Docket No. 81] is granted with respect to paragraphs 49, 50, 59, 61 and 75 of Docket No. 54; and

(4) DENIED in all other respects.

A settlement conference will be held on June 30, 2009, at 10 a.m.

BY THE COURT:

/s/Donetta W. Ambrose
Donetta W. Ambrose,
Chief U.S. District Judge